CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
May 02, 2024
LAURA A. AUSTIN, CLERK
BY: /s/T. Taylor
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| MICHAEL T. MCFARLAND,<br>    Plaintiff,<br><br>v.<br><br>MAJOR JOHNNY BILLITER, *et al.*,<br>    Defendants. | Civil Action No. 7:22-cv-00642<br><br>By: Elizabeth K. Dillon<br>    United States District Judge |

**MEMORANDUM OPINION**

Michael T. McFarland, a Virginia inmate proceeding *pro se*, brought this 42 U.S.C. § 1983 action against eight defendants. McFarland alleges Eighth Amendment claims for deliberate indifference to his serious medical needs, including an MRSA infection. (*See* Am. Compl., Dkt. No. 12.) Before the court are two motions: a motion to dismiss filed by defendants Major Johnny Billiter, Major Rick Alsbrook, Captain Patricia McCoy, and Officer William Looney, collectively the Jail Defendants (Dkt. No. 40), and a motion for summary judgment filed by defendants Crystal Large, NP, Megan Goodie, RN, and Monique Yates, LPN, referred to as the Medical Defendants (Dkt. No. 42).[1]

For the reasons stated below, these motions will be granted.[2]

---

[1] The eighth defendant, Dr. Christopher Copley, has not been served and has not appeared in this action. The amended complaint refers to him as Dr. "Coyley", but the correct spelling is Copley. The court will direct the clerk to correct the spelling on the docket.

[2] In their reply in support of their motion to dismiss, the Jail Defendants rely upon the evidence provided by the Medical Defendants to argue that they are entitled to dismissal of McFarland's claims against them. Thus, because they have relied upon evidence outside of the pleadings, the court finds it appropriate to convert their motion into one for summary judgment and treat it as such. The court also concludes that it is not necessary to provide further notice to plaintiff because the court issued a joint *Roseboro* notice for the pending motions alerting plaintiff that he had twenty-one days to "submit any further counter-affidavits or other relevant evidence contradicting, explaining or avoiding Defendant's evidence." (Dkt. No. 44.)

I.  BACKGROUND

A. **Plaintiff's Amended Complaint**

McFarland alleges that the defendants violated his constitutional rights by denying him medical treatment during his time incarcerated at Southwest Regional Jail – Tazewell and Southwest Regional Jail – Haysi.  He alleges four claims.

In the first claim, plaintiff alleges that while incarcerated at Tazewell, another inmate, Anthony Nance, developed an infection at the top of his leg, which tested positive for MRSA.[3] (Am. Compl. 2, 4.)  Large and Goodie, two nurses at the jail, were going to place Nance in the medical unit, but Nance talked them out of doing so, and he was left in the same pod with plaintiff, who then contracted MRSA a few days later, on February 28, 2022.  (*Id.* at 4.)  On March 6, plaintiff was transported to the Clinch Valley Medical Center (CVMC) where he underwent surgery the following day to remove the infection from his left wrist.  (*Id.*)  Plaintiff was released from the hospital on March 9, 2022, and returned to the Tazewell Jail, where he was placed in the medical unit.  As of February 2, 2023, plaintiff has had 14 MRSA outbreaks.

In claim two, plaintiff alleges that he was moved to Haysi on April 23, 2022.  (*Id.* at 3.) On May 4, 2022, Copley and Yates performed a painful medical procedure on the plaintiff to remove an infection in the presence of Officer Looney.  Plaintiff alleges that Looney did not intervene or attempt to stop the procedure.  (*Id.* at 5.)

In the third claim, plaintiff alleges that he never received any paperwork, pamphlets, instructions, or advice on what to do to keep staph or MRSA from returning until August 16, 2022.  He states that he was advised by Nurse Large that he would always have MRSA.  (*Id.* at 6.)

---

[3] MRSA stands for Methicillin-resistant Staphylococcus aureus.

Finally, plaintiff's fourth claim mentions defendants Copley, Large, Alsbrook, Billiter and McCoy.  Plaintiff alleges that between March 1, 2022, and February 6, 2023, he has "put in grievances" to these defendants "about [his] health." (*Id.*)  He alleges that he asked his criminal lawyer to call the Jail and ask that the plaintiff be taken to "a specialist that can see why [he] keep[s] getting these infections," and complains that all that is being done to treat him is "keeping [him] on antibiotics that obviously isn't working." (*Id.*)

**B. Plaintiff's Medical History**

Throughout his incarceration, the Medical Defendants provided plaintiff with regular care and treatment for the MRSA infection that he developed after tattooing with unsanitary treatment. (Ex. C, Wexford Medical Records, Dkt. No. 43-3.)  The Medical Defendants also assessed and treated McFarland on numerous occasions in response to his complaints of earache and chest pain. (*Id.*)  A summary of McFarland's treatment is set forth below.

McFarland was booked into Tazewell on December 1, 2021. (Wexford 1–8.)  The screening nurse, Lakin Helton, LPN, documented a history of substance abuse including benzodiazepines, methamphetamines, and heroin. (*Id.*)  McFarland also had a history of intravenous drug administration and reported he had done so earlier that day. (*Id.*)  Upon physical examination, Nurse Helton observed swelling and pitting on McFarland's legs. (*Id.*)  She also noted scars, tattoos, and edema to both legs with "scabbed over places above ankles." (*Id.*)  McFarland was found suitable for housing as deemed appropriate by security. (*Id.*)  McFarland was then scheduled for an initial 14-day assessment. (*Id.*)

On December 3, 2021, McFarland was placed on opiate withdrawal protocol due to his long history of chronic opiate use, and he was evaluated by Darla Blankenship, LPN. (*Id.* at 19–

3

21.) McFarland's COWS Score was 19, which indicated his withdrawal was moderate. McFarland was scheduled to be seen by a physician within seven days. (*Id.*)

The medical department received McFarland's records from his admission to Clinch Valley Medical Center (CVMC) on November 22, 2021. (*Id.* at 16.) The records indicated he had been given a 14-day course of doxycycline and prescribed Vistaril 25 mg on an as-needed basis. (*Id.*) Mandy Chittum, LPN, noted that when McFarland reported this hospitalization to nursing staff, he represented that he had been seen more recently than two days prior. (*Id.*) Additionally, it was documented in the CVMC records that McFarland exhibited drug-seeking behavior for pain medication and asked for "dope" to increase his immune system. (*Id.*)

On December 15, 2021, NP Large performed McFarland's 14-day assessment. (*Id.* at 9–13.) She documented that McFarland was underweight with blackened teeth, clear lungs, and normal cardiovascular status. She further noted tattoos on his abdomen, arms, back and chest. McFarland's overall health was "good", and he reported no specific medical issues. Based on his receiving screening and her assessment, NP Large determined that McFarland did not require additional follow up at that time. (*Id.*)

On December 26, 2021, McFarland placed a medical request to see a doctor and a mental health provider. (*Id.* at 149–50.) Nursing staff informed McFarland that a cardiologist request would be submitted and that he was on the list to see a mental health coordinator. (*Id.*) April Mullins, a mental health provider, assessed McFarland on January 14, 2022. (*Id.* at 271–75, 280.) On January 31, 2022, McFarland again inquired about the status of a cardiologist consult and was advised by nursing staff that he was on the list to be reviewed by a doctor. (*Id.* at 156.)

McFarland placed sick calls on March 2 and 6, 2022. (*Id.* at 89.) On both occasions his vital signs were stable, but it appeared that McFarland had developed an infection. (*Id.*; Ex. A,

Large Aff. ¶ 8, Dkt. No. 43-1.) Medical staff determined that he contracted an infection after giving himself a tattoo using unsanitary tattoo-making instruments that he shared with another inmate. (Large Aff. 8.) This directly contradicts McFarland's allegation that he contracted MRSA from physical contact with a fellow inmate. McFarland was advised several times by various medical staff to stop tattooing and shaving because such behaviors increased his risk of developing an infection. (Large Aff. ¶ 16; Ex. B, Goodie Aff. ¶ 16, Dkt. No. 43-2.) Against this advice, McFarland continued to tattoo and shave throughout his incarceration. (*Id.*)

On March 7, 2022, McFarland was admitted to CVMC for an incision and drainage procedure for an abscess that formed on his left forearm and wrist. (Wexford 16.) During this admission, a wound culture was obtained and was positive for methicillin-resistant staph aureus (MRSA). McFarland was prescribed a course of Bactrim. (*Id.* at 93.) On March 8, McFarland returned to Tazewell with orders for wet-to-dry dressings along with a prescription for a ten-day course of clindamycin. McFarland was monitored in the Special Housing Unit and received daily dressing changes from medical staff, including Nurse Goodie, for approximately two weeks. (Goodie Aff. 11–12.)

McFarland reported left wrist pain again on March 21, 2022. (Wexford 163.) Nurse Goodie assessed McFarland on this date for a dressing change and noted some redness and swelling to the area. (Goodie Aff. ¶ 11.) Nurse Goodie cleaned the wound and changed the dressings and provided a heat pack to alleviate McFarland's pain. On March 23, 2022, NP Large saw McFarland for complaints associated with his left wrist. (Wexford 200–01.) Upon examination of the wound, she noted sutures from McFarland's irrigation and drainage had grown into the skin. Large determined that the sutures needed to be removed, and she did so without difficulty. She also administered a dose of intramuscular Rocephin (an antibiotic).

McFarland tolerated this well and voiced no concerns. (*Id.*) On March 28, Nurse Goodie saw McFarland for another dressing change. (Goodie Aff. ¶ 12.) On this occasion the wound was red and swollen, and Nurse Goodie documented a small amount of yellow drainage on the dressing. (*Id.*) She cleaned the wound with normal saline and applied a clean dressing. McFarland requested additional pain medication following this visit, and Nurse Goodie responded that she would see what else could be done for him. (*Id.*)

On March 29, 2022, Dr. Walid Azzo at Clinch Valley Orthopedics saw McFarland for evaluation of his left forearm abscess debridement. (Wexford 288.) Dr. Azzo documented that McFarland's pain was "manageable" and that he was doing well, remained afebrile, and had a good appetite. (*Id.*) Alignment of his left forearm was normal without swelling, and the wound was described as clean and dry with no drainage or redness. Dr. Azzo provided instructions for continuing daily wet-to-dry dressing until the area closed. McFarland was to return for follow up only as needed, and no scheduled follow-up visits were made. (*Id.*)

On April 21, 2022, McFarland placed a sick call requesting to be seen because his ear hurt. (Wexford 169.) The following day, Nurse Goodie examined McFarland's ear and noted no redness or swelling. (Goodie Aff. ¶ 14.) His eardrum was intact and shiny gray in color. Nurse Goodie informed McFarland that she saw no infection or injury. She considered prescribing Tylenol for his reported pain, but McFarland's history of hepatitis made Tylenol contraindicated due to its hepatotoxic properties. (*Id.*)

McFarland was transferred to Haysi on April 23, 2022. McFarland denied any open wounds, rashes, or sores upon his arrival. Two days later, he placed a sick call stating that his ear was still hurting. (Wexford 89.) McFarland was examined by nursing staff who found that McFarland's ear was clear of any drainage or redness. (*Id.* at 15.)

Then, on April 28, 2022, McFarland placed another sick call regarding his ear pain and pain under his arm from a "knot." (Wexford 208–09.) Nurse Gloria Kelly examined the area and noted a red, swollen, hard area in McFarland's left underarm. McFarland's vital signs were taken and found to be within normal limits. Nurse Kelly spoke with NP Large, who prescribed a ten-day course of Bactrim. (*Id.* at 196.)

McFarland placed another sick call regarding his left underarm on May 3, 2022. (Wexford 210.) The next day, Dr. Christopher Copley examined McFarland and noted that the left underarm boil increased in size despite one week of Bactrim. (*Id.* at 195–96.) Dr. Copley tried to aspirate fluid from the area with little return. He further offered McFarland an I&D, but McFarland refused this treatment. McFarland was prescribed three antibiotics and placed in the special housing unit until May 16, at which time his underarm was noted to be healed. (*Id.* at 192.) Dr. Copley noted the same. (*Id.*)

On May 31, 2022, McFarland place a sick request reporting that he had scraped his left ear. (Wexford 134, 213.) Toni Hale, RN, assessed the area and noted a small sore to the inner ear. (*Id.* at 213.) The following day, McFarland reported that he had put something in his ear, and Nurse Hale documented that his ear had been impacted. Nurse Hale instructed McFarland to not put things in his ears, and to follow up with the clinic for irrigation. (*Id.* at 52.)

McFarland was seen by Dr. Copley for concerns about his reported prior heart problems and chest pain on June 1, 2022. (Wexford 191.) McFarland had complained of a cough and chest pain with deep inspiration as well as congestion and a left earache. He asked to see a cardiologist. Dr. Copley documented that McFarland's lungs were clear and his heart rate and rhythm were regular. Dr. Copley diagnosed a resolving upper respiratory infection and bronchitis and advised McFarland to maintain hydration and to continue using an inhaler as

7

needed. Dr. Copley further documented that he planned to review McFarland's prior medical records to verify his reported history of endocarditis. (*Id.*)

NP Large saw McFarland on June 21, 2022, in response to a sick call he placed regarding ear pain. (Wexford 190.) He reported that an ingrown hair was causing pain and he wanted it removed. NP Large documented McFarland's prior MSRA infection and surgery to the left wrist while at Tazewell due to tattooing. NP Large noted purulent drainage within the left ear canal and an abscess. She prescribed Bactrim twice daily for ten days along with ear drops and scheduled Tylenol. She also ordered labs and an EKG in response to McFarland's reports of chest pain and endocarditis. (*Id.*) A few days later, McFarland's labs returned essentially normal. (*Id.* at 96–100.) The EKG was completed on June 27, 2022, and revealed a normal sinus rhythm with a rate of 76 bpm. (*Id.* at 309–10.)

On July 15, 2022, McFarland was seen by Copley for ongoing complaints of earache. (Wexford 189.) Dr. Copley documented that the left ear was swollen and red. He prescribed Levaquin, an antibiotic, for one week and eardrops. (*Id.*)

On August 15, 2022, McFarland filed a medical grievance stating that his hand was giving him problems after catching MRSA at Tazewell. (Wexford 143–44.) He reported five additional infections since his initial infection and claimed he was not being treated for endocarditis. McFarland requested a furlough and/or release for treatment. In response to this grievance, McFarland was told he was on the list to see the doctor at the next available date and was to discuss any furlough or release with his lawyer. *Id.*

NP Large examined McFarland the following day, on August 16. (*Id.* at 187.) McFarland also reported recurring chest pain and referenced an overdose that had occurred the prior October. He indicated he had been hospitalized and diagnosed with endocarditis, but that

8

he had left the hospital against medical advice. McFarland stated he had been worrying about this diagnosis since he was incarcerated. NP Large documented that McFarland had been hospitalized in March due to staph infection from tattooing and that he was treated with intravenous and oral antibiotics. NP Large also documented that McFarland had a new tattoo on his left arm, which she described as scabbed over. NP Large submitted a request for an echocardiogram to Utilization Management and prescribed a triple antibiotic ointment for McFarland's left inner ear canal. She also told McFarland to stop tattooing. (*Id.*) Records later received by the Medical Defendants from McFarland's visit to Princeton Community Hospital Bluefield in November 2021 did not support McFarland's reported endocarditis diagnosis. (Ex. D, Bluefield Medical Records 1–35.)

Throughout September 2022, McFarland submitted numerous sick call requests regarding his left ear infection and earaches and an infection under the right arm pit. (Wexford 186, 227–29.) Monique Yates, LPN, saw McFarland on September 2, and noted redness in McFarland's outer ear canal. (*Id.* at 186.) There was no drainage, but Yates felt a lump. Nurse Yates diagnosed McFarland with ear pain and a possible boil, and NP Large ordered Bactrim and Tylenol. On September 13, Nurse Kelly examined a small, raised area on McFarland's right armpit and documented that McFarland had shaved arms, armpits, and a fresh tattoo on his forearm. She also noted that he had no signs or symptoms of an infection. (*Id.*) Nurse Kelly placed McFarland on boil protocol and instructed him how to cleanse the area and apply warm soaks. (*Id.* at 60–61.) On September 27, NP Large prescribed amoxicillin (an antibiotic) to address McFarland's reports of right earache and drainage. (*Id.* at 136–37.)

On October 12, 2022, McFarland asked to see nursing staff for "staff [sic] coming under [his] arm and around [his] butthole." (Wexford 234.) McFarland reported that this was his ninth

9

infection since March 1, 2022. Nurse Kelly saw McFarland on that same date and documented a one-centimeter, hardened area in McFarland's left armpit and a small, raised area in the right armpit. (*Id.* at 184–85.) No redness or drainage was noted. Nursing also documented an abrasion to the outer ear canal, the cause of which McFarland denied knowing. Nurse Kelly noted that McFarland had been seen shaving his body, arms, armpits, chest, and abdomen. She also observed tattoos in varied stages of healing. McFarland was advised to stop tattooing and reeducated about the risks of prematurely discontinuing antibiotics. (*Id.*)

On October 15, 2022, McFarland fainted while in his cell, and LPN Yates responded. (Wexford 15.) Yates took his vital signs, which were stable, and documented that he was alert, pale, and slightly diaphoretic. After laying down on his bunk, McFarland reported feeling better. Three days later, on October 18, NP Large documented that McFarland was charged with having "hooch" in his property bag, and that his fainting was likely due to intoxication. (*Id.* at 14.) NP Large temporarily discontinued McFarland's psychotropic medications due to potential for overdose, and she transferred him to the Special Housing Unit for closer monitoring. (*Id.*)

McFarland placed another sick call request, on October 29, 2022, related to a left ear infection. (Wexford 241.) He reported it "busted open and was draining" and stated that his right upper arm infection "was about to bust any second." McFarland further reported his chest was hurting and he did not feel well. Margie Coleman, LPN, examined McFarland and noted that his left ear was clean with no redness or drainage. (*Id.* at 181–82.) She noted a boil on his right armpit which she described as red from a greenish center and drainage. This area was cultured and confirmed for MRSA. McFarland was prescribed Tylenol and instructed on warm soaks to the area. McFarland was also placed back in the Special Housing Unit where he was

10

provided wet-to-dry dressings and warm soaks twice daily for the next five days. Nurse Large prescribed McFarland another course of Bactrim. (*Id.*)

McFarland requested to be seen again on November 1, 2022, because he was feeling "bad all over." (Wexford 180.) NP Large saw McFarland, and he reported left ear pain and concerns related to his abscesses and reported history of endocarditis. NP Large diagnosed and treated McFarland for a left inner ear abscess and right axillary abscess. She gave him Neosporin ear drops and scheduled 800 mg of ibuprofen three times daily. Blood cultures were drawn with negative results. McFarland's other labs were within normal limits, and his white blood cell count was not elevated. (*Id.*)

NP Large reexamined McFarland on November 29, 2022, due to recurrent skin infections and reports of chest pain. (Wexford 177.) NP Large observed several scabbed areas on his skin. She prescribed Hibicleanse instead of soap when showering, along with lotion for the next 30 days. She also ordered a chest x-ray. (*Id.*)

Through December 2022, McFarland continued to place sick call requests related to his left ear. (Wexford 251–55.) NP Large examined McFarland on December 6, and documented recurrent headaches, sinus infections, and abscesses all stemming from an infected tattoo that had been surgically treated. (*Id.* at 177.) McFarland's left ear canal was swollen, and Large could not visualize a tympanic membrane. NP Large diagnosed McFarland with left ear otitis media and sinusitis and prescribed him Rocephin and Bactrim. She also prescribed three days of Tylenol #3 for pain. McFarland was placed on the Medical Observation Unit, and NP Large noted she would consider ordering a head CT if he did not improve. (*Id.*) On December 10, McFarland denied further pain or issues with his ear, and requested discontinuation of ibuprofen and return to the pod because he felt "a lot better." (*Id.* at 14, 257.)

11

McFarland placed a sick call request on January 19, 2023, claiming he had MRSA inside his left ear that had developed from a scratch on his right arm. (Wexford 176.) Kimberlee Baker, LPN, examined McFarland and noted a small scratch on his left arm and provided a Band-Aid. McFarland was started on earache protocol and prescribed Tylenol for pain. (*Id.*)

On February 12, 2023, nursing was called to McFarland's cell for loss of consciousness and disorientation. (Wexford 204–05.) His skin was pale and cool to the touch. McFarland was taken to the medical unit and place on oxygen via nasal cannula. NP Large ordered his transfer to the emergency department for evaluation, and he was transported via ambulance to Dickerson County Hospital, where he was treated for dehydration and discharged later that day. (*Id.* at 14.) Heather Greer, FNP, evaluated McFarland the following day and documented clear lungs and normal cardiovascular status with full range of motion and no deficits. (*Id.* at 174–75.) Her assessment included dehydration and acute bacterial sinusitis. She advised an increase in water intake and prescribed a ten-day course of Augmentin (an antibiotic). (*Id.*)

On March 13, 2023, McFarland placed a sick call request for a new infection under his left armpit. (Wexford 171.) Nurse Yates assessed McFarland and noted a small round spot under his left axilla with no drainage. McFarland was prescribed a ten-day course of Bactrim. (*Id.*) Over the next several days, the area decreased in size and McFarland did not develop drainage or odor. (*Id.* at 203–04.)

On March 20, 2023, McFarland was seen by cardiologist Madhava Pally, MD upon the referral of NP Large due to the syncopal episode in February. (Wexford at 300–05.) Dr. Pally noted that the syncope had occurred after urination. Dr. Pally prescribed Protonix for acid reflux and ordered labs and an echocardiogram. The echocardiogram revealed mild tricuspid insufficiency but was otherwise normal. (*Id.*)

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of fact precludes summary judgment. *Anderson*, 477 U.S. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence is "so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

The submissions of *pro se* litigants are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). That notwithstanding, the court must also abide the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).

**B. Eighth Amendment**

The Eighth Amendment protects prisoners from "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). That protection imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of . . . inmates." *Whitley*, 475 U.S. at 320. Some Eighth Amendment violations constitute "deliberate indifference," while others constitute "excessive force." *Id.*; *Thompson v. Commonwealth of Va.*, 878 F.3d 89, 97 (4th Cir. 2017). The deliberate indifference standard generally applies to cases alleging failures to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, or failing to render medical assistance. *See Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer*, 511 U.S. at 834–37; *Heyer v. United States Bureau of Prisons*, 849 F.3d 209–10 (4th Cir. 2017). Objectively, the medical condition at issue must be serious. *Hudson*, 503 U.S. at 9. "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the

14

necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)).

After a serious medical need is established, a successful claim requires proof that the defendant was subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 842. "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). Indeed, "many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). A mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).

**C. Medical Defendants' Motion**

McFarland's first claim is that he contracted MSRA from an inmate at Tazewell because the Medical Defendants (Nurses Large and Goodie) refused to remove the inmate from McFarland's pod. In fact, the evidence demonstrates that McFarland contracted MSRA from excessive tattooing and the use of shared unsanitary tattoo-making equipment, which staff repeatedly advised McFarland against continuing. (Wexford 187, 190, 234; Large Aff. ¶ 16.) McFarland was noted as having fresh tattoos on several occasions and was observed tattooing and shaving, again despite providers telling him to stop. Thus, this injury was not caused by any deliberately indifferent actions or inactions by the Medical Defendants. *See Evans v. Chambers*,

703 F.3d 636, 647 (4th Cir. 2012) (explaining that constitutional torts "require a demonstration of both but-for and proximate causation"). McFarland denies that his infections were caused by tattoos or shaving because if he had been caught tattooing, he would have been given an inhouse charge. (Dkt. No. 48 at 1.) Even if McFarland did not receive any charges for tattooing, this does not disprove the medical evidence which demonstrates that he was.

Moreover, and even if McFarland had contracted MSRA from another inmate, the record clearly demonstrates that the defendants were not deliberately indifferent to McFarland's serious medical needs. Instead, the Medical Defendants evaluated McFarland's various complaints, provided him with care and treatment, and sought care from outside providers when appropriate. For example, as it pertains to McFarland's MSRA infection in March 2022, NP Large ordered his transfer to CVMC for surgical removal and drainage, and he was prescribed antibiotics. (Wexford 16.) After returning, McFarland was placed in the Special Housing Unit and given regular wound cleanings and dressing changes. (Wexford 94–95, 201–02.) With subsequent infections, McFarland received assessments and various treatments, including antibiotics, aspiration, and warm soaks. McFarland argues that the frequency of his infections shows that the treatments provided by the Medical Defendants were not working (Dkt. No. 48 at 2), but this does not meet the high standard for deliberate indifference.

McFarland also alleges that on May 4, 2022, Dr. Copley and Nurse Yates caused him "excruciating pain" while attempting to treat an infection in his armpit. The records show that McFarland was seen on this date by Yates and Copley for a boil on his left underarm, which had not resolved after a week of antibiotics. (Wexford 195–96.) The boil was draining spontaneously. McFarland refused to undergo incision and drainage, so he was given another week of antibiotics. The records do not indicate any pain or discomfort reported by McFarland.

16

(*Id.*)  Therefore, there are no issues of material fact that the Medical Defendants acted recklessly in treating this issue.

To the extent that McFarland is claiming that the Medical Defendants were deliberately indifferent to pain or sores in McFarland's ear, they acted reasonably, as McFarland was assessed and treated with antibiotics and ear drops.  (*See* Wexford 186, 189, 220.)

Finally, McFarland claims that he had endocarditis before his incarceration in December 2021 (Compl. 6), and in his motion for a preliminary injunction,[4] he asserts that he is in "imminent danger of serious physical injury" because the Medical Defendants refused to allow him to be seen by a cardiologist.  (Dkt. No. 13.)  First, McFarland's medical records from Bluefield do not support his allegation that he was diagnosed with endocarditis.  (Bluefield 1–35.)  Therefore, the record establishes that McFarland did not have a serious medical condition causing him chest pain.  Moreover, McFarland was seen and assessed on several occasions by the Medical Defendants for his reports of chest pain.  In June 2022, NP Large ordered an EKG that showed normal sinus rhythm.  (Wexford 309–10.)  In February 2023, McFarland's level of care was increased after a syncopal episode.  McFarland was referred to a cardiologist, who found no irregularities and no reason for further treatment or evaluation.  (*Id.* at 300–05.)  Therefore, the Medical Defendants were not deliberately indifferent to any of McFarland's cardiac issues.

Finally, plaintiff's allegation that he was not educated about MSRA is belied by the record, which shows that the Medical Defendants repeatedly advised him to stop tattooing to avoid the risk of infected equipment.

For these reasons, the Medical Defendants are entitled to summary judgment.

---

[4] The court denied this motion on April 20, 2023.  (Dkt. No. 23.)

**D. Jail Defendants' Motion**

Plaintiff alleges that the Jail Defendants were deliberately indifferent to plaintiff's serious medical needs. To bring a denial of medical treatment claim against a non-medical prison official, an inmate must show that the official was personally involved with a denial of treatment, deliberately interfered with a prison doctor's treatment, or tacitly authorized or was indifferent to the prison doctor's misconduct. *Johnson v. Clarke*, Civil Action No. 7:20-cv-00717, 2021 WL 1536585, at *2 (W.D. Va. Apr. 19, 2021) (citing *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990)). Non-medical prison officials, such as the Jail Defendants, are entitled to rely on medical staff to make proper medical judgments; they "cannot be liable for the medical staff's diagnostic decisions" and "cannot substitute their judgment for a medical professional's prescription." *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002); *Miltier*, 896 F.2d at 854 (explaining that non-medical staff at a prison are entitled to rely on the opinion of medical staff as to whether the plaintiff needed additional medical care and/or testing). The Jail Defendants were justified in relying upon the treatment provided by the Medical Defendants, and because the Medical Defendants did not act with deliberate indifference, neither did the Jail Defendants.

In his response to the Jail Defendants' motion to dismiss, McFarland argues that defendant Alsbrook "had officers" who knew how bad Nance's infection was, and Alsbrook should have intervened to isolate Nance and prevent McFarland from being infected. (Dkt. No. 46 at 2.) As discussed herein, the medical records indicate that McFarland was infected by sharing unsanitary tattooing equipment, not from contact with an infected inmate. Moreover, McFarland's contention that unspecified "officers" were aware of the inmate's infection is insufficient to show that Alsbrook "actually knew of and ignored" the risk to McFarland's safety. *Young v. City of Mt. Ranier*, 328 F.3d 567, 576 (4th Cir. 2001). Finally, McFarland has not established the elements to impose supervisory liability: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and

unreasonable risk of constitutional injury; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). There is no evidence that Albrook knew that the officers working for him observed the infection and did not take action to protect plaintiff's health.

Plaintiff also alleges that defendant Looney did not intervene to prevent Copley and Large from performing painful procedure. (Am. Compl. 5; Dkt. No. 46 at 2.) He claims that they "squeezed and stabbed" the infected area, even though the medical staff previously said that you are not supposed to "squeeze on these infections." (*Id.*) Again, the medical record demonstrates that the Medical Defendants provided adequate medical treatment and were not deliberately indifferent to plaintiff's condition, and Looney was entitled to rely on the medical judgment of the Medical Defendants.

Finally, plaintiff's claim about MSRA education can be dismissed for the reasons already stated. Moreover, the amended complaint does not mention any of the Jail Defendants in this claim. *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017) (explaining that liability will lie under § 1983 only "where it is affirmatively shown that the official charged acted personally" in the violation of plaintiff's rights).

For these reasons, the court will also grant summary judgment to the Jail Defendants.

### III. CONCLUSION

The court will issue an appropriate order granting the motions for summary judgment filed by the Medical Defendants and the Jail Defendants.

Entered: May 2, 2024.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge